[No. 499-1.    Division One—Panel 2.    July 12, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN HOWARD LARUE, *Appellant*.

*Smith & Welden* and *Daniel Hoyt Smith,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *John E. Nelson, Deputy,* for respondent.

JAMES, J.—Steven Howard LaRue was convicted of the crime of forgery in the first degree. At trial he waived a jury and stipulated that the state's evidence would establish the following:

That on September 2, 1969, a Travelers Express personal money order in the amount of $25 was stolen from a Seattle business establishment. LaRue could not have stolen the money order because he was in the Washington State Penitentiary on the day that it was stolen.

That the money order form provided appropriate spaces for the date, a serial number, the name of the payee, and the purchaser's signature and address. Except for the imprinted dollar amount and a magnetic computer processing number, the stolen money order was in blank.

That on November 19, 1969, credit cards belonging to one Goldsmith were stolen from his automobile.

That on December 1, 1969, LaRue attempted to purchase an electric razor from a J. C. Penney department store. He offered the stolen money order in payment. In the presence of store employees he completed the money order form, writing the date, the name "Penneys" as payee, and signing Goldsmith's name in the blank designated "purchaser's name." The sales person directed LaRue to the credit office where he endorsed the money order with the name Goldsmith on its reverse side. While LaRue was still in the credit office, it was ascertained that the money order had been stolen. When LaRue was asked to wait, he attempted to flee, and it was necessary to forcibly restrain him.

LaRue testified that he found the money order on the floor of a tavern shortly before going to the Penneys store. He said that he found a wallet on the curb opposite the front

door of the store and that credit cards of Goldsmith were in the wallet. He further testified that he believed that the money order had a value of $25 regardless of the name written in the space designated for the purchaser's signature and that he had no intention of defrauding Goldsmith or anyone else. He stated that he used Goldsmith's name because he was unable to provide any satisfactory identification of himself.

LaRue argues that he is not guilty of forgery as a matter of law. His reasoning is that the writing of another's name on a personal money order cannot constitute forgery because the signature in the space designated "purchaser's name" has no effect on the validity of a money order.

LaRue points out that it is not the practice of issuers of personal money orders to retain specimens of the signatures of the persons to whom the money orders are sold, and therefore the issuers will accept and pay when the orders are presented no matter who signs as purchaser. LaRue reasons that it must necessarily follow that his writing a false signature did not in any way affect the validity or negotiability of the money order. LaRue claims that Penneys would not have lost anything had it completed the transaction and that under no circumstances was Goldsmith harmed by the use of his name.

Insofar as applicable to LaRue's admitted acts, the crime of forgery is defined by RCW 9.44.020 as follows:

> Every person who, with intent to defraud, shall forge any writing or instrument by which any claim, privilege, right, obligation or authority, or any right or title to property, real or personal, is or purports to be . . . evidenced, created . . . transferred . . . or affected, or any request for the payment of money or delivery of property or any assurance of money or property, or any writing or instrument for the identification of any person . . . shall be guilty of forgery in the first degree . . .

The essence of the crime of forgery is stated in 36 Am. Jur. 2d *Forgery* § 1 (1968):

> Forgery may be defined as the fraudulent making or

alteration of a writing to the prejudice of another man's rights or as the false making or material alteration, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability.

(Footnotes omitted.)

The test of whether or not a false writing is a forgery is frequently stated to be whether or not the writing, if genuine, would have efficacy as affecting some legal right. *State v. Haislip*, 77 Wn.2d 838, 467 P.2d 284 (1970).

Personal money orders have been characterized as "mavericks" under the Uniform Commercial Code, RCW 62A. See Comment, *Personal Money Orders and Teller's Checks: Mavericks Under the UCC*, 67 Col. L. Rev. 524, 525 (1967); also, 85 The Banking Law Journal 95 (1968).[1] The author of the comment notes that there is confusion among banks, payees and purchasers of personal money orders as to their precise legal nature. It has been held that a personal money

---

[1] "Personal money orders were first issued in 1937 and have grown steadily in popularity since 1944, when the price of the competing Post Office Money Order was raised. Personal money orders are attractive to people who have no ordinary checking accounts, for they offer a safe, inexpensive, and readily acceptable means of transferring funds, in a form that has the prestigious appearance of a personal check. Moreover, banks favor the instruments because they are simpler, faster, and less expensive to issue than cashier's checks and bank money orders; because they attract potential customers for other bank services; and because they can create a substantial deposit balance for the bank's use.

"The typical personal money order consists of a check-sized form containing the name of the issuing bank, an amount impressed into the paper, an identification number, and an indication that it is not valid in excess of a specified sum, usually between $100 and $250. A widely used 'snap-out' form of the order has three elements: the instrument itself, a register copy kept by the bank, and a customer's record copy. While all three record the identification number and amount of the order, the bank's copy does not indicate the identity of the purchaser or the payee. The customer may complete the original and his copy by filling in the name of the payee, the date, and his own signature at any time after he purchases the instrument. However, bold-face print on the customer's copy often cautions him to fill out the order promptly and to save the copy; it may even state that the customer assumes responsibility for his failure to do so." (Footnotes omitted.)

order is "akin" to a bank cashier's check and thus represents a direct bank obligation to pay a holder. *Rose Check Cashing Serv., Inc. v. Chemical Bank N. Y. Trust Co.,* 43 Misc. 2d 679, 252 N.Y.S.2d 100 (1964). This view of the nature of a personal money order would tend to support LaRue's theory.

■■ However, in a later New York case, the holding of *Rose Check Cashing Serv., Inc. v. Chemical Bank N. Y. Trust Co., supra,* was rejected. *Garden Check Cashing Serv., Inc. v. First Nat'l City Bank,* 25 App. Div. 2d 137, 267 N.Y.S.2d 698 (1966). In the ruling, which was affirmed by New York's highest appellate court (*Garden Check Cashing Serv., Inc. v. First Nat'l City Bank,* 18 N.Y.2d 941, 277 N.Y.S.2d 141, 223 N.E.2d 566 (1966)), it was held that a personal money order is essentially the equivalent of a personal check. The rationale of the decision is that the drawer (purchaser) of a money order does not purchase the drawee's (the bank's)[2] credit. He merely deposits a sum of money with the drawee against which he may draw by written order. This view of the legal nature of a personal money order finds support in the provisions of the Uniform Commercial Code. A personal money order, in all respects, fulfills the definition of a "draft" under the provisions of RCW 62A.3-104.[3]

---

[2]In this case, American Express fills the role of drawee usually performed by a bank.

[3]"(1) Any writing to be a negotiable instrument within this Article must

"(a) be signed by the maker or drawer; and

"(b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and

"(c) be payable on demand or at a definite time; and

"(d) be payable to order or to bearer.

"(2) A writing which complies with the requirements of this section is

"(a) a 'draft' ('bill of exchange') if it is an order;

"(b) a 'check' if it is a draft drawn on a bank and payable on demand;

"(c) a 'certificate of deposit' if it is an acknowledgment by a bank of receipt of money with an engagement to repay it;

"(d) a 'note' if it is a promise other than a certificate of deposit."

A "check" is also a "draft" if it is drawn on a bank and payable on demand. RCW 62A.3-104.

A "draft" is an "order to pay" but is not an assignment of funds.

> A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

RCW 62A.3-409 (1).

An inherent right of the drawer of a draft is the right to stop payment before it had been accepted by the drawee. Here the drawer, the Seattle business establishment from which the money order was stolen, had the right to stop payment before the money order was accepted by the drawee, American Express. The purchaser's magnetic computer processing numbered copy of the money order and American Express' similar copy would provide the means of identifying the money order which LaRue attempted to cash when it was presented, even though American Express' copy did not identify the purchaser by name.

When the nature of a personal money order is thus conceived, it is clear that when LaRue wrote a false name as drawer of the money order with the intent that Penneys accept it, he forged the instrument. Penneys was entitled to accept the order in the belief that the signature of the drawer was genuine and thus know that, if the drawer stopped payment, it would have recourse against him. To this end it was prudent that Penneys identify the drawer of the money order. Under the circumstances, LaRue's use of the Goldsmith name as purchaser (drawer) of the money order was a forgery *if* his intent was to defraud Penneys.

LaRue filed a supplemental pro se brief which we consider with the brief submitted by his appointed counsel. In each brief error is assigned to the failure of the trial judge to formally find as a fact that LaRue had the "intent" to defraud.

■■ Trial courts and prosecuting attorneys have been repeatedly admonished that RCW 4.44.050, RCW 10.46.070,

and CR 52 require formal findings of fact and conclusions of law as to each element of a crime charged when a defendant in a criminal trial has waived his right to have his guilt or innocence adjudged by a jury. We reemphasize the importance of this requirement. *See State v. Russell*, 68 Wn.2d 748, 415 P.2d 503 (1966).

The state has responded to LaRue's challenge by directing our attention to the fact that although there was no finding of fact on the issue of intent, the trial judge's second conclusion of law is "[t]hat the defendant Steven Howard LaRue is guilty of the crime of forgery in the first degree *as charged in the information . . .*." (Italics ours.) The state points out that the information charges LaRue with "intent" to defraud. Therefore, the state reasons, the trial judge found "intent" as a fact but combined that finding with his conclusion as to guilt. But the rule of *State v. Russell, supra* at 750 is that

> general findings such as "the matters and things set forth in the complaint are true," are "entirely insufficient" for an appellate review. [*Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 40, 395 P.2d 633 (1964).]

The crime of forgery is made up of two separate elements. The first element is the physical act of falsifying a writing, and the second is an intent to defraud. This case is unusual in that LaRue concedes that he falsified the signature of Goldsmith upon the money order, and as hereinbefore discussed, the first element of the crime is thus established.

To reach his conclusion that LaRue's acts were such as to make him "guilty of the crime of forgery in the first degree as charged in the information herein," the trial judge necessarily had to find as a fact that LaRue falsified the money order with the "intent" to defaud. In the absence of a precise finding of fact as to "intent," we have examined the trial judge's oral opinion and have considered it to the extent that it is complementary to and explanatory of his formal findings of fact. *Stevens v. Stevens*, 4 Wn. App. 79, 480 P.2d 238 (1971). In giving his oral opinion, the trial

judge said, "[U]nder the facts and the law [I] find that he did forge this document, and attempt to *pass it off* for the purchase of merchandise, and is guilty of the charge." (Italics ours.) In this context, the words "pass it off" must reasonably be read as a finding that LaRue intended to defraud.

As in this case, the defendant in *State v. Knudsen,* 154 Wash. 87, 280 P. 922 (1929), did not contest the state's evidence. It was there held that:

> This case is, however, unusual in that the record discloses no dispute as to the facts. Appellant did not take the stand on his own behalf, nor did he offer or introduce any evidence. No conflict whatever appears in the testimony given by the different witnesses for respondent, and in such a case, the failure of the trial court to make findings of fact must be held to constitute an irregularity only, as this court is in exactly as good a position to determine the facts as was the trial court.

*State v. Knudsen, supra* at 100.

We are satisfied that when the findings of fact and conclusions of law are read with the trial judge's oral opinion, the requirements of RCW 4.44.050, RCW 10.46.070 and CR 52 are met.

As a further assignment of error, LaRue asserts that in any event the evidence does not support a finding that he intended to defraud.

■ Intent is a state of mind. As such, it must usually be proved by circumstantial evidence. 21 Am. Jur. 2d *Criminal Law* § 82 (1965); *State v. Gaul,* 88 Wash. 295, 152 P. 1029 (1915). The circumstances of the transaction, including LaRue's unlikely story of finding both the stolen money order and the stolen credit cards, and his attempt to avoid detention constitute persuasive and sufficient evidence to support a finding of intent to defraud.

In his pro se brief LaRue asserts that he was denied counsel at the preliminary hearing which culminated in his being bound over to superior court.

■ A preliminary hearing, though dispensable under Washington statutes, is nevertheless, if held, a "critical

stage" in a criminal proceeding. *Coleman v. Alabama,* 399 U.S. 1, 26 L. Ed. 2d 387, 90 S. Ct. 1999 (1970); *Tully v. State,* 4 Wn. App. 720, 483 P.2d 1268 (1971).

When LaRue's pro se brief was filed, this court requested his counsel and the state to file supplemental briefs and additional portions of the record which would enable this court to properly resolve the issue.

The facts so developed establish that LaRue was represented at the preliminary hearing. Counsel conceded this at oral argument.

At the preliminary hearing LaRue told the judge that he had retained an attorney. When reached by telephone, the attorney informed the judge that he did not represent LaRue. The judge then appointed an attorney present in the courtroom to represent LaRue. Although LaRue's request for a continuance was denied, he was given leave to re-subpoena the witnesses. Three witnesses for the state were then called. LaRue was not bound over at the conclusion of the first hearing. Two additional hearings were held and on each occasion LaRue was represented by the attorney appointed at the first hearing. We find that LaRue was effectively represented by counsel at the preliminary hearing.

LaRue's final assignment of error arises out of the following facts. The trial took place on March 2, 1970, and on that day the trial judge gave his oral ruling and finding of guilt. On March 6, 1970, a formal judgment and sentence was entered. No findings of fact or conclusions of law were entered. On April 2, 1970, LaRue filed his notice of appeal. On April 16, 1970, the trial judge signed an order which vacated the judgment and sentence entered on March 6. Findings of fact, conclusions of law and a second judgment and sentence were then entered under the date of April 16, 1970. It is LaRue's contention that his notice of appeal deprived the superior court of jurisdiction and that the findings, conclusions and judgment entered on April 16 are a nullity.

As LaRue contends, CAROA 15 transferred juris-

diction to this court upon the filing of his notice of appeal. However, this court has the power to remand and reinstate jurisdiction in the trial court for the purpose of the entry of findings of fact and conclusions of law. *Seattle v. Silverman,* 35 Wn.2d 574, 214 P.2d 180 (1950); *State v. Russell, supra.*

Where, as here, the trial court belatedly entered findings and conclusions, it would be a useless procedure to now remand for this purpose. The irregularity does not require a reversal of the conviction as LaRue contends.

Finally, LaRue asks that in any event, we rule that his sentence run from March 6, 1970, the date of the first formal judgment and sentence. Fundamental justice would require that LaRue's request be granted. We so order.

In all other respects, the judgment is affirmed.

FARRIS, A.C.J., and SWANSON, J., concur.